UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| TIM PEREZ AND NORMA PEREZ,<br><br>Plaintiffs,<br><br>v.<br><br>STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY,<br><br>Defendants. | Case No. 2:14-cv-02005-RFB-PAL<br><br>**<u>ORDER</u>** |

**I.     INTRODUCTION**

Before the Court is Defendant's Motion for Summary Judgment. ECF No. 41. For the reasons stated below, the Motion is granted in part and denied in part.

**II.    BACKGROUND**

Defendant State Farm filed a petition for removal with the court on December 3, 2014. ECF No. 1. Defendant filed the instant Motion for Summary Judgment on April 1, 2016. ECF No. 46. Defendant filed first Errata to the Motion on April 4, 2016, and a second Errata on April 8, 2016. ECF Nos. 47, 48. The Motion for Summary Judgment seeks judgment as to the first and third claims, for tortious bad-faith claim handling and violation of 686A.310 unfair practices, respectively. At the hearing Plaintiffs voluntarily dismissed their statutory unfair practices claims. Therefore, this order will address only the claim for tortious breach of the implied covenant of good faith and fair dealing.

### III. LEGAL STANDARD

#### A. Motion for Summary Judgment

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). When considering the propriety of summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party. Gonzalez v. City of Anaheim, 747 F.3d 789, 793 (9th Cir. 2014). If the movant has carried its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott v. Harris, 550 U.S. 372, 380 (2007) (alteration in original) (internal quotation marks omitted).

### IV. UNDISPUTED FACTS

The Court finds the following facts to be undisputed.  On June 4, 2014, Norma Perez, 56, was the driver and Tim Perez, 51, the front seat passenger in their 2006 Nissan Altima traveling westbound on Azure. Norma proceeded to attempt a left hand turn onto southbound Lamb on a green signal when a 1999 Dodge Caravan, driven by Layla Salas and traveling northbound on Lamb in a 1999 Dodge Caravan, failed to stop for the red signal, entered the intersection and struck the left front of the Altima. The Las Vegas Metropolitan Police Department responded to the accident and completed a Traffic Accident Report. The accident report indicates that both Tim and Norma were wearing their shoulder and lap belts and that both front airbags deployed. Both Tim and Norma were transported by Medic West to UMC Trauma Center. The plaintiffs received treatment following the accident from the following providers in the following amounts:

Tim Perez: Medic West Ambulance: $1,231.98; University Medical Center $12,971.29; Las Vegas Radiology: $3,300; Nevada Rehabilitation Center: $4,479; and Dr. Richard

Cestkowski: $3,437.00

Norma Perez: Medic West Ambulance: $1,231.98; University Medical Center $13,360.76; Las Vegas Radiology: $3,300.00; Nevada Rehabilitation Center: $2,824.00; Dr. Richard Cestkowski: $2,575.00; and Nevada Orthopedic & Spine Center: $341.00.

Tim and Norma were insured under a policy of motor vehicle liability insurance issued by State Farm, policy no. 005 6534-F2 l-28Q (the "Policy"). The policy included uninsured motorist ("UM") coverage with limits of $25,000/$50,000 and medical payments coverage ("MPC") of $10,000. Salas was insured by Key Insurance Company ("KIC") with liability limits of $15,000. The Perezes each settled with Salas for the $15,000 limit.

On June 6, Kirk T. Kennedy ("Kennedy") of the Law Office of Kirk T. Kennedy sent State Farm a letter of representation. Kennedy advised of the claim and requested that all correspondence go through his office. State Farm received a policy limit, time limit demand on August 29, 2014 (dated August 27). The demand briefly summarized the claimed injuries of each insured, advised that each had settled for the $15,000 tortfeasor's limits, and demanded payment of the $25,000 Uninsured Motorist limits for each. The demand outlined medical specials of $23,291.74 for Norma and $25,419.27 for Tim (he noted that Norma's claim was pending additional bills). Kennedy stated his opinion that the true value of the case exceeded $70,000 per client and demanded that State Farm tender the UIM policy limit of $25,000 to each insured. The demand included correspondence from KIC (tortfeasor Salas' insurance) offering $15,000 to settle each claim, a copy of the accident report, and medical bills and records. That same day, Kennedy contacted State Farm requesting the status of the demand. State Farm employee Tiffany Wheeler ("Wheeler") advised that the demand had been received but had not yet been reviewed. Wheeler indicated she would send a notice to the claim representative. She also noted claims' review was pending her completion of "bookmarking" the demand and updating the "specials and injuries details" within the system

On September 19, 2014, State Farm claims handler Natalie Ross evaluated the injuries. Ross reviewed Norma Perez's injuries (C/L radiculitis. C/T/L sprain strain, sacroiliac sprain/strain, rotator cuff sprain/strain, left elbow contusion, kit wrist contusion), medical specials of $23,704.74

- 3 -

(noting that $14,708.67 of this was diagnostic), and facts of the accident (severe front end impact with airbag deployment). She noted that no wage loss claim had been presented. She noted that this was a soft tissue injury case with 2.5 months of treatment, at the end of which Norma had asked to be released from treatment. Based on the above, Ross evaluated Norma's general damages as worth from $7,000 to $9,000 (for a total claim value of $30,704.74 to $32,704.74). Applying the offsets for the tortfoasor's policy limits ($15,000) and MPC limits ($10,000), the UIM claim value fell between $5,714.74 and $7,704.74.

Ross reviewed Tim Perez's injuries (severe C/T/L sprain/strain, sacroiliac sprain/strain, cervical radiculitis, rotator cuff sprain/strain and various contusions), medical specials of $25,419.20 (noting that $15,597.67 of this was diagnostic), and facts of the accident (severe front end impact with airbag deployment). She noted that no wage loss claim had been presented. She noted that this was a soft tissue injury case with 2.5 months of treatment, at the end of which Tim had asked to be released from treatment. Based on the above, Ross evaluated Tim's general damages as worth from $7,000 to $9,000 (for a total claim value of $32,419.20 to $34,419.20). Applying the offsets for the tortfeasor's policy limits ($15,000) and MPC limits ($10,000), the UIM claim value fell between $7,419.20 and $9,419.20.

Ross then called Kennedy and advised that State Farm had reviewed both demands. Ross reviewed the facts and injuries with Kennedy and indicated that State Farm had considered all treatment. She inquired whether he was aware of the $10,000 Medical Payment Claim (MPC) offset and Kennedy indicated he was. Ross advised that based on the information as of that date, State Farm would offer $6,000 for Norma and $7,500 for Tim. Kennedy countered at $20,000 for each. Ross advised State Farm was nowhere near that number and countered with $6,800 for Norma and $8,300 for Tim. Kennedy advised he would have to get back to State Farm. Ross confirmed the offers in writing on September 20, 2014.

On September 26, 2014, Ross called Kennedy and advised that the MPC department was still reviewing bills and records, and once complete, the MPC offsets might be reduced. She advised that the MPC review should be completed early the next week, and she would notify Kennedy once she knew the final offsets. She confirmed this in writing.

- 4 -

On October 8, 2014 Ross spoke with Casares who confirmed that the Medical Payments Coverage ("MPC") claim was still open for both insureds, and that additional bills for Norma had recently been received and paid. Casares advised he would review in several days and would close the claim if no new bills had been received. Ross placed the claim on a "short diary" to confirm the MPC offsets. She noted the claim was pending confirmation of the final MPC payment for final offsets, as well as a response to State Farm's offers ($6,800 for Norma and $8,300 for Tim). Ross left a message for Kennedy regarding the same. Ross spoke with Kennedy later that day. She advised State Farm should have the final MPC offset by Monday, October 13, 2014. Kennedy advised that he did not want to wait and wanted an offer "now." Ross advised that she had made offers on the claim and advised that the initial offer would go up if the MPC offset ended up being less than $10,000. Kennedy advised he did not want to make a counter demand and only wanted the policy limits of $25,000 for each insured. On October 9, 2014 Ross contacted Kennedy and left a message advising that based on the available information. State Farm's offers remained the same. However, she also advised that once the Medical Payments department finalized their coverage, the offsets might go down which would increase the initial offer amount. She requested Kennedy call her to discuss the basis for his belief that the claims were worth the $25,000 policy limits. On October 10, 2014, Ross sent Kennedy a letter, reiterating the above.

On November 6, 2014, State Farm received notice of this litigation. State Farm retained defense counsel and continued to evaluate the claim as additional information on the claims was obtained through discovery. Kennedy advised that his clients stopped treating and had no plans to get more medical treatment. In December 2014, with nothing new to consider, State Farm increased their offer to the top end of its evaluation and conveyed these offers through counsel: $12,697.29 for Tim and $11,216.45 for Norma. These increased offers also reflected the fact that Plaintiffs had not submitted the remainder of their medical bills for payment through the med pay coverage as had been expected. Thus, instead of a $10,000 med pay offset, State Farm applied a $6,721.91 offset for Tim and a $6,488.29 offset for Norma. On January 4, 2015, Kennedy rejected the offers indicating he move forward all the way to trial and seek punitive damages.

On April 27. 2015, Plaintiffs provided their responses to State Farm's interrogatories. On

April 28, 2015, Plaintiffs provided their joint answers to State Farm's requests for production of documents. Here, for the first time, Plaintiffs provided information regarding Tim's lost wage claim of $4,096.84. Likewise, on April 28, 2016, Plaintiffs served a supplement to their joint answers to State Farm's requests for production indicating that Norma had taken FMLA time totaling 168 hours. Norma's verified interrogatory responses indicated an hourly pay rate of $25/hour for a total lost wage claim of $4200. Upon receipt and review of this additional information, State Farm included the lost wages in its evaluation. On May 28, 2015, State Farm through counsel offered the high value of its current evaluation, $15,792.33 for Norma and $16,793.49 for Tim.

State Farm took the depositions of Tim and Norma on June 4, 2015. During their depositions, Tim and Norma both described that they had continuing pain after cessation of treatment. Upon receipt and review of this additional information, Ross updated her evaluation to include an additional amount for "future" pain and suffering following their cessation of treatment. Ross included a range of $1,000 to $1,500 for Tim's future' pain and suffering and a range $1000 to $l,500 for Norma's future pain and suffering. This brought the claim values to between $15,794.13 to $18,294.13 for Tim and between $14,416.45 to $16, 916.45 for Norma. In July, 2015, State Farm through counsel offered the high value of its evaluation, $18,294.13 for Tim and $16,916.45 for Norma. Plaintiffs again rejected the offers indicating they would accept nothing less than policy limits. At this point, there was no additional information forthcoming that would impact the claim evaluation. Likewise, it was clear that the parties had reached an impasse with regard to negotiating the claims. As such, on July 30, 2015, State Farm paid to Plaintiffs the amount of its last offer, $18,294.13 to Tim, and $16,916.45 to Norma.

## V. DISCUSSION

### A. Legal Standard

"Nevada law recognizes the existence of an implied covenant of good faith and fair dealing in every contract. An insurer fails to act in good faith when it refuses without proper cause to compensate the insured for a loss covered by the policy." Pemberton v. Farmers Ins. Exchange, 858 P.2d 380, 382 (Nev. 1993) (internal citations and quotation marks omitted). "[W]e hold that that an insured may institute a bad faith action against his or her insurer once the insured establishes "legal entitlement" and unreasonable conduct by the insurer concerning its obligations to the insureds." Id. at 384. "Legal entitlement has been interpreted to mean that the insured must be able to establish fault on the part of the uninsured motorist which gives rise to the damages and to prove the extent of those damages." Id. (internal citations and quotation marks omitted). "To establish a prima facie case of bad-faith refusal to pay an insurance claim, the plaintiff must establish [1] that the insurer had no reasonable basis for disputing coverage, and [2] that the insurer knew or recklessly disregarded the fact that there was no reasonable basis for disputing coverage." Powers v. United Services Auto. Ass'n, 962 P.2d 596, 702-03 (Nev. 1998).

"A jury is permitted wide latitude in awarding tort damages, and the jury's findings will be upheld if supported by substantial evidence. Substantial evidence is that which a reasonable mind might accept as adequate to support a conclusion." Quintero v. McDonald, 14 P.3d 522, 532 (Nev. 2000) (internal citations and quotation marks omitted).

### B. Discussion

#### i. Parties' Arguments

Defendant argues that this is merely a value dispute based on the fairly debatable value of the claims—essentially that there was a reasonable basis for disputing coverage. Defendant did not dispute causation or reasonableness of medical treatment and relied on records provided by Plaintiffs; Defendant simply came to a different value determination. Defendant immediately determined the medical payment benefits were due and issued those payments as bills were received. When Plaintiffs insisted on policy limits, Defendant reached out to understand the basis. Plaintiffs did not respond and instituted litigation. Plaintiff's counsel provided inaccurate

information to Defendant about treatment status, and failed to provide information about the lost wage claim until relatively late. Defendant timely considered all information available to it and made reasonable decisions, including increasing offers proportionate to new information as to new damages and lower offsets.

Plaintiffs argues that as of July 22, 2015, Defendant valued each Plaintiff's claim at between $16,000 and $20,000 but prior to litigation never offered any settlement in a range consistent with that evaluation. Plaintiff argues that when State farm received the UIM demands from Plaintiff's counsel in August 2014, they were immediately on notice of $23,291 in medical specials for Norma, and $25,419 for Tim, and that they had settled for the full value of the third-party tortfeasor's coverage. Yet in September 2014, Adjuster Ross valued the claims for general damages of $7,000 to $9,000. Plaintiff argues that it was unreasonable to value a moderate injury claim in this range, given undisputed medical bills of approximately 25,000 each. Plaintiff argues that this was unreasonable even without awareness of the lost wages damages. Plaintiff argues that where there were overall medical damages of approximately $25,000, it is reasonable for overall damages to be within a range of $70,000.

### ii. Discussion

There are few if any disputed facts as to the values at issue and the handling of the claims. The parties do not appear to dispute the cost of treatment, or the evaluation of damages other than general damages. Plaintiffs' arguments amounts to an attack on the evaluation of general damages, essentially that given roughly $25,000 in compensatory medical damages for each Plaintiff, an initial evaluation of $7,000 to $9,000 for each Plaintiff, later adjusted as new information emerged, including $1,000-1,500 each for future pain, was so unreasonable as to constitute a bad faith violation. Plaintiff provides no law or expert testimony/declaration to support the contention that this was an unreasonable evaluation, but states that the values themselves show unreasonableness sufficient to take the question to a jury. Defendant argues that a mere value dispute cannot state a claim for tortious bad-faith claim handling, but cites no binding authority to support this proposition.

The undisputed facts indicate that Defendant documented the relevant injuries and treatment, and updated the general damages (pain and suffering) in response to testimony as to probable future pain. Plaintiff has not disputed that after Ross contacted Kennedy on October 9-10, 2014, asking for the basis for his assertion that the claim was worth the policy limits, Kennedy did not respond. Plaintiff asserts no basis, and could not assert any basis for the tortious breach claim other than unreasonably low offers in light of the undisputed inputs, primarily the medical specials.

The Court finds that no binding authority precludes a bad faith claim based on unreasonably low claim evaluation and consequent failure to accept demands or provide a reasonable offer. "An insurer fails to act in good faith when it refuses without proper cause to compensate the insured for a loss covered by the policy." Pemberton, 858 P.2d at 382. "To establish a prima facie case of bad-faith refusal to pay an insurance claim, the plaintiff must establish [1] that the insurer had no reasonable basis for disputing coverage, and [2] that the insurer knew or recklessly disregarded the fact that there was no reasonable basis for disputing coverage." Powers v. United Services Auto. Ass'n, 962 P.2d 596, 702-03 (Nev. 1998). An insurance provider could meet this standard where there is a reasonable evaluation for a claim based on undisputed inputs, and a provider knowingly or recklessly disregards that value in its handling of the claim. Defendant has provided no binding authority and no expert testimony as to a reasonable evaluation in this case and the court has no objective means of determining what a reasonable evaluation would be. The Court finds that where, as here, the amount of medical specials as compared to the amount of an offer creates a plausible inference that the offer is not reasonable, and there is no expert or other evidence with which to determine reasonability, there is a dispute of material fact, and summary judgment must be denied.

### iii. Punitive Damages

"Except as otherwise provided in NRS 42.007, in an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud or malice, express or implied, the plaintiff, in addition to the compensatory damages, may recover damages for the sake of example and by way of punishing

the defendant[.]" NRS 42.005. "Under NRS 42.001, malice, express or implied means conduct which is intended to injure a person or despicable conduct which is engaged in with a conscious disregard of the rights or safety of others.  Similarly, oppression' means despicable conduct that subjects a person to cruel and unjust hardship with conscious disregard of the rights of the person. Both definitions utilize conscious disregard of a person's rights as a common mental element, which in turn is defined as the knowledge of the probable harmful consequences of a wrongful act and a willful and deliberate failure to act to avoid those consequences." Countrywide Home Loans, Inc. v. Thitchener, 192 P.3d 243, 252 (Nev. 2008). "The trial court is responsible to determine, as a matter of law, whether the plaintiff has offered substantial evidence of malice, in fact, to support a punitive damage instruction." Smith's Food & Drug Centers, Inc. v. Bellegarde, 958 P.2d 1208, 1211 (Nev. 2009) (emphasis added), overruled on other grounds in Countrywide.

Nevada follows the rule that proof of bad faith, by itself, does not establish liability for punitive damages." United Fire Ins. Co. v. McClelland, 780 P.2d 193, 198 (Nev. 1989). Defendant has presented evidence that it and the claim handlers conscientiously investigated, evaluated, and negotiated the claim, including by increasing their offer in proportion to new information as to damages for future pain and suffering, lost income, and lower offsets. The only evidence supporting the bad faith claim is the value of the offers relative to the value of the undisputed inputs. This does not amount to "substantial evidence" of malice nor show that substantial evidence of malice could be presented at trial. Therefore, the Court will grant the Motion for Summary judgment on this issue and preclude punitive damages in this case.

## VI. CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that ECF No. 46 Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART. Summary judgment is granted in favor of Defendant on Count III for violations of NRS 686A.310 Unfair Practices, as stipulated in the hearing on February 15, 2017. Summary judgment is granted in favor of Defendant as to punitive damages, although Plaintiff may make an argument for such damages if further relevant information comes to light. The claim for breach of the implied covenant of good faith may proceed.

**DATED**: March 28, 2017.

_____
**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**